UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

James Wellington,
    Petitioner

    v.                               Civil No. 04-cv-478-SM
                                        Opinion No. 2005 DNH 135
Larry Blaisdell, Acting Warden,
Northern New Hampshire
Correctional Facility,
    Respondent

**O R D E R**

James Wellington, an inmate at the Northern New Hampshire Correctional Facility, petitions for a writ of habeas corpus. 28 U.S.C. § 2254.  He argues that his state incarceration is unconstitutional because his convictions – for aggravated felonious sexual assault, aggravated sexual assault, and indecent exposure and lewdness – resulted from the trial court's decision to deny him funds to secure the services of an expert witness in the field of child witness interviewing.  Before the court is respondent's motion for summary judgment.  Petitioner objects. For the reasons given, respondent's motion for summary judgment is granted.

**The Legal Standard**

Passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), has significantly limited the power of the federal courts to grant habeas corpus relief to state prisoners.  A federal court may disturb a state conviction only when: (1) the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2); or (2) the state court's resolution of the issues before it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 399 (2000).

The distinction between decisions that are "contrary to" clearly established federal law and those involving an "unreasonable application" of federal law has been explained by the United States Supreme Court:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

2

Court on a question of law or if the state court
decides a case differently than [the Supreme] Court has
on a set of materially indistinguishable facts.  Under
the "unreasonable application" clause, a federal habeas
court may grant the writ if the state court identifies
the correct governing legal principle from [the
Supreme] Court's decisions but unreasonably applies
that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412–13.

"AEDPA's strict standard of review only applies to a 'claim
that was adjudicated on the merits in state court proceedings.'"
Norton v. Spencer, 351 F.3d 1, 5 (1st Cir. 2003) (quoting Fortini
v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001); citing Ellsworth v.
Warden, 333 F.3d 1, 6 (1st Cir. 2003)).  Here, all agree that the
strict standard of review applies, as petitioner's claim was
adjudicated on the merits in the New Hampshire state courts.

### Background

On September 19, 2001, Victoria C. told her mother that
James Wellington was a "bad man."[1]  The following day, Victoria

---

[1] At that time, Victoria had spent significant amounts of
time alone with Wellington, on approximately seven different
days, at a local lake, at Wellington's apartment, and at the
apartment where Victoria lived with her mother.

elaborated, telling her mother that Wellington "had tried to put his penis – and she reached towards her groin area – and that he indicated she was too small and then he used his fingers and his tongue down there." (Trial Tr. II at 41.) The events to which Victoria referred took place between approximately August 20 and September 11. As a result of Victoria's report, her mother called the police.

On September 20, 2001, the same day that Victoria told her mother about Wellington's behavior, Sergeant Norman Ashburn of the Franklin Police Department spoke with Victoria's mother, and spoke with Victoria alone, in their home. He listened to Victoria's descriptions of Wellington's actions, but asked few questions. Later, Detective Nancy Hicks met with Victoria at the police station. Victoria told Detective Hicks what had happened and also gave a written statement. In addition to her conversations with Officer Ashburn and Detective Hicks, Victoria told her story to a nurse at Franklin Hospital and had a second examination at Concord Hospital.

On September 24, Anne Pennock of the Division of Children, Youth, and Families met with Detectives Hicks and Clough at the Franklin police station, where Pennock and Detective Hicks subsequently conducted an interview with Victoria that was recorded on both audiotape and videotape.  At the outset of the interview, Victoria was eating a brownie she was given by either Pennock or Detective Hicks, and at several points, Victoria asked to play a game of hangman with Pennock.  In response, Pennock told Victoria that they could play the game after the interview was completed.  That interview included the following questions and answers:

| | |
|---|---|
| VC: | He got undressed too and showed me. |
| Anne: | And showed you? |
| VC: | Uh huh. |
| Anne: | How'd he do that? |
| VC: | Well he showed me ways on how to make a baby and on how to |
| Anne: | Would it be easier if you pointed to the picture? |
| VC: | Yes. |
| Anne: | Okay. |

VC:        Is there a girl in there?  He tried um
           (circled vagina and drew a line between
           f & m figures)

Hicks:     What did he try to do with his penis in your
           vagina?

VC:        He tried to show me how man and woman made a
           baby.

Anne:      Yeah?

VC:        Uh huh.

Hicks:     But what did he do with his penis in your
           vagina?

VC:        Well he didn't really go in but he tried to
           show me with it.  They were really (unclear)
           and then he showed me how they could have it
           but not have a baby by not using that.  (drew
           line from mouth to vagina on drawings)

Anne:      How did he show you that?  With his mouth on
           your vagina?

VC:        Uh huh.

Anne:      Yeah.

Hicks:     What did he do with his mouth?

VC:        He showed me another way on how not to have a
           baby.

Anne:      Yeah how's that?  His mouth in your vagina?

VC:        Un huh.


(Pet'r's Mot. Summ. J., Ex. 2b at 18–19.)

Prior to trial, Wellington, who was indigent and represented by the public defender, moved the court to provide $2000 to allow his counsel to consult with Dr. Phillip Esplin, an expert in interviewing techniques and child witness suggestibility.  In his motion, Wellington argued:

> There are grounds for challenging the interview techniques used in this case as improper because they were not recorded, because leading questions and anatomical drawings were used, and because the child was not asked about her memories of prior instances of abuse.  Such interview techniques, when used on a young child, can undermine the reliability of the children's statements and their subsequent testimony.

(Resp't's Mot. Summ. J., Ex. 1 ¶6 (citing S. CECI & M. BRUCK, JEOPARDY IN THE COURTROOM: A SCIENTIFIC ANALYSIS OF CHILDREN'S TESTIMONY, 233–68 (American Psychological Association); State v. Michaels, 642 A.2d 1372 (N.J. 1994); State v. Sargent, 144 N.H. 103 (1999)).  Relying on Sargent, Wellington contended that his defense required an expert to examine the transcript of the September 24 interview, to explore the possibility of false memory implantation resulting from improper interviewing techniques.[2]

_____

[2] Sargent holds that "the proper protocols and techniques used to interview child victim witnesses is a matter not within

After a hearing, and after reviewing the videotape of the
September 24 interview, Judge McGuire denied Wellington's motion.
She construed Wellington's complaint as being that the initial
interviews with Victoria were not recorded and that

> the taped interview [on September 24] was improperly
> conducted because the interviewers: 1) gave Victoria C.
> a brownie and allowed her to play a game of "hangman";
> 2) asked suggestive and leading questions; and 3)
> failed to ask her about prior instances of child abuse.

(Resp't's Mot. Summ. J., Ex. 3 at 4.)  Based upon her own review
of the videotape, Judge McGuire determined that the interviewers'
conduct was not "unduly suggestive or otherwise improper," id. at
5, because it involved neither "implied promises of reward for
specific evidence," id., nor "any improper leading or incessant
questioning."  Id.  The judge also noted that the interviewers'
questions were not improperly suggestive, based upon Victoria's
ability to "provide answers to open-ended questions."  Id.
Finally, the judge determined that, contrary to Wellington's
assertion, Victoria had not been involved in any prior instances

---

the knowledge and understanding of the average juror," 144 N.H.
at 106 (citations omitted), and that a party may introduce expert
testimony on that subject after making "a particularized showing
that improper interview techniques were used," id.

of child abuse and that, as a result, the interviewers could not be faulted for failing to inquire about prior sexual abuse.  (Id. at 6.)

Wellington moved the court to reconsider its denial of funds to hire Dr. Esplin.  In his motion, he advanced the following reasons:

I.  An interview with Dr. Esplin and information from recent depositions show that improper and leading questions were used during the interview of the alleged victim;

II.  The deposition of witnesses in this case has shown that the alleged victim was on medication at the time of the interviews, suffers from a mental illness and developmental disabilities which Dr. Esplin has said would affect her developmental age and therefore affect her susceptibility to suggestibility, and;

III.  There were multiple unrecorded interviews of the alleged victim prior to her tape recorded interview with the Franklin Police, some of which were conducted by individuals with no training in the proper interviewing of children in this area.

(Resp't's Mot. Summ. J., Ex. 4 at 1-2.)  Wellington identified the following examples of leading questioning:

During the questioning on pages 17-19 of the transcript, leading questions were used in conjunction

      with the anatomical drawings.  On page 18, when
      Victoria drew a line from the circled groin area of one
      drawing to the other, Detective Hicks said, "what did
      he try to do with his penis in your vagina?"  Three
      lines later Detective Hicks says, "But what did he do
      with his penis in your vagina?"  On page 19, the
      technique is repeated when Detective Hicks says, "Yeah
      How's that?  His mouth in your vagina?"  Dr. Esplin
      indicated that these are leading questions and are
      improper interview techniques.

Id. at 3.  Judge McGuire denied Wellington's motion to

reconsider.


      Wellington appealed to the New Hampshire Supreme Court.

State v. Wellington, 150 N.H. 782, 784 (2004).  The supreme court

affirmed, explaining that "[a]t the time of [Wellington's]

request, he merely pointed out to the trial court, through his

motions and during his motion hearings, that a few improper

techniques may have been employed during the interview without

demonstrating how those improper techniques would affect his

case."  Id. at 785.  The court further observed that "[i]n all

instances, the defendant, while citing examples of possible

improper interview techniques, failed to point out how, under the

facts and circumstances of his case, those techniques, if

improper, affected the victim's answers so that an expert was

necessary to ensure effective preparation of his case."  <u>Id.</u> at
786 (citing <u>State v. Campbell</u>, 127 N.H. 112, 115 (1985)).  The
supreme court found "no evidence that the victim's answers were a
result of any suggestibility that could be attributed to leading
questions or other allegedly improper techniques."  <u>Id.</u> at 787.
The court concluded by stating:

> The defendant must point to some evidence, aside from
> mere hope for its existence, which would tend to
> indicate a causative effect of an improper interview
> technique, and, in this case, he failed to satisfy that
> burden.

<u>Id.</u>

In his petition to this court, Wellington asserts that the
New Hampshire Supreme Court's decision was both contrary to and
an unreasonable application of the United States Supreme Court's
decision in <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).  Specifically,
he asserts that Victoria was subjected to repeated interviews;
that two of the police officers who interviewed her were not
trained in interviewing children; and that the police officers
who interviewed Victoria on September 20 did not tape record
their interviews.  He also complains that the interviewers

11

conducting the September 24 interview used leading questions and introduced sexual terms before Victoria did; used anatomical diagrams before Victoria gave a full description of the alleged assaults; and offered Victoria a reward, in the form of a game of hangman, for completing the interview.  He also asserts that Victoria may have been especially vulnerable to suggestion due to medication she was taking for depression and counseling she was receiving for poor socialization skills.

## Discussion

Respondent moves for summary judgment, arguing that petitioner was not entitled to the funds he sought because he never made anything more than "undeveloped assertions" that the requested assistance was necessary for an adequate defense.


In Ake, the decision upon which petitioner relies, the Supreme Court held that

> when a defendant has made a preliminary showing that
> his sanity at the time of the offense is likely to be a
> significant factor at trial, the Constitution requires
> that a State provide access to a psychiatrist's
> assistance on this issue if the defendant cannot
> otherwise afford one.

<u>Id.</u> at 74.  The Court explained that

> while the Court has not held that a State must purchase
> for the indigent defendant all the assistance that his
> wealthier counterpart might buy, see <u>Ross v. Moffitt</u>,
> 417 U.S. 600 (1974), it has often reaffirmed that
> fundamental fairness entitles indigent defendants to
> "an adequate opportunity to present their claims fairly
> within the adversary system," <u>id.</u>, at 612.  To
> implement this principle, we have focused on
> identifying the "basic tools of an adequate defense or
> appeal," <u>Britt v. North Carolina</u>, 404 U.S. 226, 227
> (1971), and we have required that such tools be
> provided to those defendants who cannot afford to pay
> for them.

<u>Ake</u>, 470 U.S. at 77 (parallel citations omitted.)  In another

opinion, the Supreme Court elaborated on its holding in <u>Ake</u>,

observing that a trial court's refusal to appoint various experts

to assist a criminal defendant did not violate the defendant's

due process rights when he "offered little more than undeveloped

assertions that the requested assistance would be beneficial."

<u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 n.1 (citing <u>Ake</u>, 470

U.S. at 82–83).


A. "Contrary to"

   Petitioner concedes that the New Hampshire Supreme Court did

not reach a conclusion different from that reached by the United

States Supreme Court on a materially indistinguishable set of
facts.  Instead, he rests his "contrary to" argument on the
theory that the "state court arrive[d] at a conclusion opposite
to that reached by [the Supreme] Court on a question of law."
Williams, 529 U.S. at 413.

The New Hampshire Supreme Court's decision in Wellington did
not hold that the assistance of an expert, at government expense,
need not be provided to an indigent criminal defendant who has
"made a preliminary showing" that an issue within the requested
witness's expertise was likely to be a significant factor at
trial.  Ake, 470 U.S. at 74.  Petitioner, rather, argues that the
state supreme court's ruling was contrary to Ake under principles
outlined in Williams v. Matesanz, 230 F.3d 421 (1st Cir. 2000):

> [Williams v.] Taylor[, 429 U.S. 362] and O'Brien
> [v. Dubois, 145 F.3d 16 (1st Cir. 1998)], read
> together, shed some helpful light on how [28 U.S.C.]
> section 2254(d)(1) operates.  For example, in
> discussing when a state court decision would be
> contrary to clearly established Supreme Court case law,
> the Taylor Court noted that "[a] state-court decision
> will certainly be contrary to our clearly established
> precedent if the state court applies a rule that
> contradicts the governing law set forth in our cases."
> [529 U.S. at 405].  The Court added that "[a] state-
> court decision will also be contrary to this Court's
> clearly established precedent if the state court

confronts a set of facts that are materially
indistinguishable from a decision of this Court and
nevertheless arrives at a result different from our
precedent."  Id. at [406].  These statements dovetail
with our earlier observation that the "contrary to"
prong of section 2254(d)(1) imposes a burden on the
petitioner to "show that Supreme Court precedent
requires an outcome contrary to that reached by the
relevant state court."  O"Brien, 145 F.3d at 24–25
(emphasis supplied).  Explicating what was meant by
this requirement, we stated that "the key inquiry . . .
is whether a Supreme Court rule by virtue of its
factual similarity (though not necessarily
identicality) or its distillation of general federal
law precepts into a channeled mode of analysis
specifically intended for application to variant
factual situations can fairly be said to require a
particular result in a particular case."  Id. at 25.

230 F.3d at 424–25.


Ake does not require an outcome contrary to that reached by

the New Hampshire Supreme Court in Wellington.  For one thing,

the opinion in Ake does not represent a "distillation of general

federal law precepts into a channeled mode of analysis

specifically intended for application to variant factual

situations."  Matesanz, 230 F.3d at 425 (emphasis added).  There

is nothing in Ake to suggest that the Supreme Court intended its

decision to apply to experts other than psychiatrists or to

situations other than the assertion of a defense based upon the

15

defendant's mental condition.  Rather than establishing a broadly applicable general principle, the Ake decision applied the general principle set out in Britt – that indigent criminal defendants are entitled to the basic tools of an adequate defense – to a specific set of facts.

Moreover, Ake plainly contemplates a demonstration of need, on a case-by-case basis, not a blanket entitlement to all services requested.  In petitioner's view, he made a preliminary showing of need, by pointing to allegedly improper interviewing techniques employed by those who interviewed Victoria.

But improper, clumsy, insufficient or deficient interviewing techniques do not necessarily result in false testimony or unreliable witnesses.  Petitioner failed to link the allegedly improper interviews to inculpatory testimony at trial.  An expert was not needed to opine on whether questions were leading or the police interviews deviated from accepted norms, but to testify that leading questions might have caused the witness to assert fiction as fact, or to give the interviewers' suggestions as her own memory.  The state supreme court repeatedly observed that

while Wellington identified several improper interviewing techniques, he failed to identify any of Victoria's responses during the interview, or any trial testimony, that may have been the product of the improper techniques he identified.  The court also noted several instances in which Victoria was asked a leading question but responded by disagreeing with – and correcting – the objectionable part of the question, thus negating any suggestion of implanted memory or testimony.  It seems fairly apparent that Supreme Court precedent requires an indigent defendant to make a "preliminary showing" that some inculpatory evidence that an expert might effectively undermine is likely to be presented, before the state must provide funds to secure expert services.

Ake does not require a different standard than that employed by the New Hampshire Supreme Court in Wellington.  In Ake, the defendant's sanity at the time of the offense was "seriously in question," 470 U.S. at 70, as evidenced by pre-trial behavior so bizarre that the trial judge, sua sponte, ordered a psychiatric evaluation of Ake's competency to stand trial, a subsequent diagnosis of paranoid schizophrenia; and a judicial

17

determination, six months after the offense conduct, that Ake was
incompetent to stand trial.  Id. at 71.

Here, the record discloses some leading questions by
interviewers, but answers by the victim establishing that she
effectively resisted the "implantation" of inculpatory testimony.
None of her answers were shown to be both inculpatory and
arguably the product of improper questioning.  Accordingly, the
state supreme court did not err in holding that funds for an
expert witness on that issue need not be provided, defendant
having failed to meet his burden to make a preliminary showing of
need.  The state court's holding was not contrary to Ake or other
Supreme Court precedent.

B. "Unreasonable Application"

Petitioner offers essentially the identical argument under
the "unreasonable application" prong of Williams.  (Pet'r's Resp.
to Mot. Summ. J. ¶ 11.)  He contends that the New Hampshire
Supreme Court either derived the wrong rule from Ake, by
requiring him to "explain specifically how an expert would use
the improper interviewing techniques and other factors to aid the

18

defense, at a stage in the litigation where the expert had not had the opportunity to review either the discovery or the video taped interview," or, misapplied the rule from <u>Ake</u>, by denying him expert assistance because he could not "explain the expert's conclusion before the expert [had] conducted a measured review of the case." <u>Id.</u>  For the reasons already given, it was neither contrary to <u>Ake</u> nor an unreasonable application of <u>Ake</u> for the New Hampshire Supreme Court to require Wellington to make a preliminary showing that allegedly improper interviewing techniques might have resulted in the development (and admission at trial) of unreliable inculpatory victim testimony, before public funds would be made available for expert services related to that defense.

## Conclusion

Respondent's motion for summary judgment (document no. 6) is granted and so, necessarily, Wellington's petition is dismissed. The clerk of the court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

September 27, 2005

cc:  David M. Rothstein, Esq.
     Susan P. McGinnis, Esq.